WESTERN UNION TELEGRAPH COMPANY ET AL. v. R. L. RUST.

Decided April 21, 1909.

**1.—Negligence of Servant—General and Special Master—Power of Control.**

　　Where a servant has two masters, a general and a special one, the latter, if having the power of direction or control, is the one responsible for the servant's negligence; but it is otherwise where the latter merely directs what work is to be done by a servant furnished him by another employer who pays and controls the servant.

**2.—Same—Messenger Company—Telegraph Company—Negligence of Servant.**

A messenger company kept its office with that of a telegraph company and under the management of the same agent; the messengers were paid by the former company and delivered telegrams for the latter, which paid the former for such services; messengers were also furnished to perform errands for all desiring such services; the telegraph company as a matter of accommodation to a journalist, its patron, who desired to express a package to his newspaper, sent him a messenger boy to take the package to the express office, without charge for such service; in so doing he ran his bicycle into and injured plaintiff. Held, (1) that the telegraph company and the messenger company, acting together in furnishing the messenger were his masters, and each responible for his negligence; (2) that the person sending the package, since he neither paid nor controlled the messenger, beyond indicating the work to be done, was not the one responsible to plaintiff for his negligence.

Appeal from the District Court of Travis County. Tried below before Hon. Geo. Calhoun.

*N. L. Lindsley,* for W. U. Tel. Co., *J. H. Tallichet,* for A. D. T. Co. of Texas, and for Jesse Bond. (*Geo. H. Fearons,* of counsel.)—

The verdict of the jury, in answer to the nineteenth and twentieth special issues, is contrary to and against both the law and the evidence, the evidence showing that, at the time of the accident involved herein, Jesse Bond was doing an errand for one Glenn Pricer and was under his control, and was not doing any errand for either of the defendants, nor under the control of either of them.

When a servant who is in the general employment of one person, by whom he is hired and paid and who only has the power to discharge him, is hired or lent to another person, the special master, who has the power of direction and control, and not the general master, is liable for the servant's negligence. The true test of liability is: "Whose work was the servant doing and under whose direction was he doing it?" In this case the whole evidence shows that at the time of the accident Jesse Bond was doing the work of Glenn Pricer under the direction of Glenn Pricer, and not of the defendant companies. Byrne v. K. C. F. S. & M. Ry. Co., 61 Fed., 605; Powell v. Construction Co., 88 Tenn., 692; Miller v. Railway Co., 76 Iowa, 655; 26 Cyc., 1522, and note.

The court erred in submitting to the jury as an issue the question whether, at the time of the accident involved herein, the American District Telegraph Company of Texas was a subsidiary corporation acting under the direction and control of the Western Union Telegraph Company, and the jury erred in answering said issue in the affirmative, because there was no allegation in plaintiff's pleadings to authorize the submission of said issue and no evidence to support said finding. Waters-Pierce Oil Co. v. Cook, 6 Texas Civ. App., 573.

*Fiset & McClendon,* and *D. K. Woodward, Jr.,* for appellee.

KEY, Associate Justice.—R. L. Rust brought this suit against the Western Union Telegraph Company and the American District Telegraph Company of Texas, seeking to recover damages for personal injuries sustained by him in a collision with one Jesse Bond,

a messenger boy riding a bicycle, and alleged to have been in the service of the defendants.

The Western Union Telegraph Company made Jesse Bond a party and asked for judgment over against him, in the event of judgment going against it. The two Telegraph Companies answered by general denial, sworn denial of partnership and pleas of contributory negligence and pleas over against Jesse Bond.

Defendant Jesse Bond answered by general denial and adopted the answers of the other defendants in so far as not inconsistent with his own defense.

There was a jury trial which resulted in a judgment in favor of the plaintiff for $3,600 against the two Telegraph Companies, and in favor of the two Companies over against Jesse Bond for the same amount.

The defendants have appealed and the case is presented in this court upon numerous assignments of error, but there is only one question which we deem it necessary to discuss in this opinion. The case was submitted to the jury upon special issues, and the jury found that at the time of the accident Jesse Bond was in the employ and under the control of and doing an errand for the Western Union Telegraph Company and American District Telegraph Company of Texas. The jury also found specifically that Jesse Bond was the servant and employe of the two companies at the time of the collision. All those findings are assigned as error, the contention being that, on the occasion under consideration, Jesse Bond was the servant of one Glenn Pricer, and not the servant of either of the Telegraph Companies, and therefore the latter can not be held responsible for Jesse Bond's negligence. The testimony bearing on that question is stated as follows in the briefs:

Appellants' brief: "Jesse Bond for plaintiff testified: Last May I was working for the Western Union Telegraph Company. . . . I know Mr. O. D. Parker, he is manager of the Western Union. I had been working for the Western Union Telegraph Company for two or three months, I think, in May, 1907. I carried messages and packages. The clerks and people that were working for Mr. Parker would tell me where to carry the messages and packages, and the Western Union Telegraph Company paid me. They paid me all the way from $15 to $20. Messengers were supposed to use a bicycle or a horse; they required me to have a bicycle or horse. That was so we would not be so long in doing the work. We were supposed to do our work quickly. They paid us in cash or checks, either one. When I would get a check I don't remember what company's check it was; I don't remember whether it was the Western Union Telegraph Company's check or whose name it would be in. I remember having to take a package from the Capitol down to the depot last May. I think it was Smith Jackson, a clerk down at the Western Union Office told me to go up and get the package; he told me they wanted me up at the Capitol to take a package to the depot. I don't remember the name of the man he told me that wanted me. He told me I would find the man up there, and I think I found him up there waiting at the door of the Capitol, and he gave me a

package. It was a newspaper budget going to the San Antonio Express, I think. It was in a big envelope. He told me to take it to the train going to San Antonio, but I don't know what numbered train it was. The man did not pay me anything. He said I did not have much time to catch the train, and that I would have to hurry and I did hurry. I rode my bicycle in going to the train, and went on the west side of the Avenue in going down. . . . An accident happened when I got down past Ninth Street. I hit a man and knocked him down, and it knocked me off the wheel. I got up after I fell. . . . The caps that most of us boys wear say on top 'A. D. T.' and 'Western Union' on the badge. There are two different kinds of caps, I think. 'A. D. T.' means American District Telegraph. I do not know positively as to which company was employing me. I did not sign any pay roll. Mr. Parker just gave me the money was all. We signed something when paid, but I don't know whether it was a pay roll or not. . . . Whenever I would go to answer a call for a messenger the office people would give me a call slip. I don't remember whether it said Western Union or American District on the call slips. When I would go to the persons wanting a messenger would tell me what I wanted. I think the name of the man up at the Capitol that gave me the package to take to the train was Glenn Pricer, a newspaper man. I went to the Capitol and was ready to go where he said for me to go. If he had sent me in some other direction than to the depot, I would have gone, as we were supposed to go wherever people wanted us to. When I would run an errand I would have to report back to the office where I had been. I think clerk Jackson told me to go up to the Capitol that evening. He did not tell me whether to go fast or slow or anything about it; he simply told me to go up there, that a man wanted me to go out some place for him. The man gave me a package to take to the train, but he did not give me any message of any kind for the Western Union Telegraph Company, to be forwarded by the Western Union. He gave me only the one package. I did not carry any message for any person at the time. The man told me I would have to hurry or I might miss the train. Nobody else told me to hurry except the newspaper man or whoever he was, and if I hurried more than usual it was at his request. . . . This cap handed me is one of the caps worn by the messenger boys. This cap has the letters 'A. D. T.' and the words 'Western Union' on it. This paper handed me is a call slip. It says 'American District Telegraph Company.' I don't remember whether I had one of the call slips when I went up to the capitol on the evening of the accident or not. I don't remember whether they gave me a call slip or not when I went up to the capitol on this occasion; sometimes when they sent us up there they did not give us anything, but just told us to go. I had done this work before for that man. I went up there to do what the man told me to do. The Western Union Company sent me up there for that purpose, and the man told me to hurry. 'W. U.' are the letters in the last column of this call slip, but I don't know what they mean. Some of these columns are filled in when a messenger goes on an errand. The number of the messenger is put

in under the word 'Messenger.' 'Called' means the hour the messenger is called. 'Returned' means when the messenger returns to the office. I never did collect anything from Mr. Pricer at any time. It is usual for messengers to collect when sent out on errands. I guess 'W. U.' stands for Western Union, but I don't know what they put that on there for. I think this is a correct copy of the words and letters and everything on the front part of this cap. The letters 'A. D. T.' are in the right place and the 'Western Union' is in the right place under the 'A. D. T.' The number is in the right place, and the two tacks that hold it on are in the right place. . . . I delivered telegraph messages sometimes. I did not take off my cap and put on another when I delivered Western Union messages; I did not wear any cap nor any badge; they never did give me any to wear. I delivered telegrams or packages whenever they told me to. I don't know that I could have managed my wheel any better without that package in my hand. A large package would interfere with managing the wheel, but a small package would not.

"O. D. Parker, a witness for defendant Western Union Telegraph Company, testified: I am local manager for the Western Union Telegraph Company, and also local manager for the American District Telegraph Company. I have been manager of the Western Union in Austin for about fifteen years. The American District Company has been in Austin about six or seven years. The American District is a new concern in Texas. The business of the Western Union Telegraph Company is to receive and send telegrams; it does not do anything else. The business of the American District Telegraph Company is the running of errands for anyone that wishes a messenger boy. The American District Company has call boxes established around the city. For instance, if you have a call box in your place of business and you want to send a boy on an errand, you turn in a call from that box; that call goes into the office and a messenger boy is sent to see what you want. If you have a parcel to be delivered, the boy delivers it, or if you have a telegram to be taken to the Western Union Office the boy takes it. The American District Company had burglar alarms and things like that in other cities, but not in Austin. The call boxes are operated by means of electric wires. The Western Union Telegraph Company has no interest that I know of in the wires and call boxes of the American District Company. The properties of the two companies are rendered separately for taxes. This boy, Jesse Bond, was employed by the American District Telegraph Company. I was in Austin at the time of the accident to Mr. Rust in May, 1907. Jesse Bond was working for the American District Telegraph Company. The two companies occupy the same office in Austin. The Western Union rents the building and the American District Company pays the Western Union so much for the privilege of having their headquarters there. Telegrams for delivery are delivered by the American District messengers. The Western Union pays the American District so much for each telegram that they deliver here and so much for every telegram the messenger boys bring in. That is the way the American District Company gets its compensation for the work done—carrying mes-

sages for the Western Union and carrying parcels for the public. Jesse Bond signed the monthly pay-roll. This is an impression copy of the pay-roll. The original pay-roll is not here, it was sent off to headquarters in Dallas with the reports for the month of May. The pay-rolls that he signed were on blanks. Jesse Bond was never paid anything within my knowledge by the Western Union Company while he worked there. I paid him his salary as manager. The American District Company is the only company that has had any messenger boys working out of the office here for years. Generally when we would get a call for a messenger we would give the boy one of the call slips, but might not if the clerk happened to be busy. The call slips are all American District slips; that is the only kind we have ever had. The Western Union had never had any call slips. We would give the boy one of the slips as a general thing and instruct him to go to Mr. So and So or to such and such a street number, as the case might be to see what was wanted. If a call came in from outside the office, we would send a boy to the person. If we took in a package at the office to be delivered somewhere, the boy might be given special instructions if the party gave special instructions. If a call came in from the capitol we would just direct the messenger to go to that person. After the boy leaves the office we have no control over him—he goes to the man and the man keeps him as long as he pleases, and the boy returns and reports his time. So far as I know, the American District and the Western Union are separate corporations. At the time of the accident Mr. Pricer was one of the correspondents of the San Antonio Express, and Mr. Hornaday was another. I state as matter of fact that Jesse Bond was employed by the American District Telegraph Company of Texas. The Western Union Telegraph Company has no messengers and that was the case in May, 1907, and has been for several years. I was the only one that was employed by both companies. As matter of convenience sometimes my clerk or assistant would control the boys in my absence. The American District Telegraph Company of Texas operates in most of the large cities in Texas, and what I have stated applies generally. We have a sign out there, and everything the American District Company uses is marked 'A. D. T.' I don't know that I have ever taken pains to tell the boys, 'Now you are working for the American District Telegraph Company.' They look in a measure to me about as much as to anything else. . . .

"Glenn Pricer was correspondent here for the San Antonio Express. As to how Jesse Bond happened to do that work for nothing for Mr. Pricer, as I understand, he went to the capitol to get what is called the news budget to be mailed on the train. Newspaper correspondents send a great deal of matter from here by telegraph. over the Western Union wires, and there is a great deal of competition between the Western Union and the Postal Telegraph Company to get that business, and they extend courtesies and favors to the newspaper correspondents. Every time a reporter calls for a messenger boy and he does any work for him in getting his budget and mailing it, the Western Union pays the American District Company for that boy's time. This work was really done for the newspaper man,

at the Western Union Company's expense. The Western Union was to get the benefit of the good will of the newspaper man by delivering the package. In order to keep the newspaper men as our customers, we afford them special complimentary facilities. If a messenger boy was neglectful and slow I would tell him he must be prompt. At the same time I have warned them repeatedly not to take any undue risks—I have cautioned them, if anything, to be otherwise. I tell the boys how they should do the work, and instruct them how the work should be done when they come there as green hands. I did not say that Jesse Bond was doing this piece of work for the Western Union. As to whether or not the package was being carried for the Western Union is something for you to decide; I have stated the facts. The package was being carried from the capitol to the depot at Mr. Pricer's request. Mr. Pricer does not run my office. He called for the boy, and the Western Union in exchange for the business they would get from this man, would pay the American District Company for his time. The Western Union paid the American District Company for the boy's services and Mr. Pricer got the services. I can not say positively who asked the boy to do the service for Mr. Pricer. I know that when that boy was sent there he was sent there as an American District Company boy. We will say that Mr. Pricer called up the office where both companies are located and asked for a boy, he called up the clerk that answered the phone. He called up the Western Union and asked that a messenger boy be sent him. I suppose a clerk in the office started the boy off. . . . Jesse Bond was working only for the American District Company and was wholly under its control. If anyone gave him any instructions in the office, it was in my behalf, assisting me in a general way, but he was strictly employed by and working for the American District Company. Jesse Bond was under the directions of the American District Company until he was sent to a certain place, then if the party wanted to send him anywhere else he would send him as an employe of the American District Company, under the party's directions, because the American District Company would know nothing about where he was going. He would be under the directions of the person who put in the call."

Appellee's brief: "In addition to appellant's statement, Mr. O. D. Parker, local manager of the defendant corporations testified: Glenn Pricer was correspondent here for the San Antonio Express. As to how Jesse Bond happened to do that work for nothing for Mr. Pricer, as I understand, he went to the capitol to get what is called the news budget to be mailed on the train. Newspaper correspondents send a great deal of matter from here by telegraph over the Western Union wires, and there is a great deal of competition between the Western Union and the Postal Telegraph Company to get that business; and they extend courtesies and favors to the newspaper correspondents.

"Every time a reporter calls for a messenger boy and he does any work for him in getting his budget and mailing it, the Western Union pays the American District Company for that boy's time. This work was really done for the newspaper man at the Western Union

Company's expense. The Western Union was to get the benefit of the good will of the newspaper man by delivering the package. In order to keep the newspaper men as our customers, we afford them special complimentary facilities.

"If a messenger boy were neglectful and slow I would tell him he must be prompt. At the same time I have warned them not to take any undue risks. I have cautioned them, if anything, to be otherwise. I tell the boys how they should do the work, and instruct them how the work should be done when they come there as green hands."

Counsel for appellant contend that the facts disclosed by the testimony quoted show that this case belongs in that class of cases where a servant has two masters, one a general and the other a special master and the latter having the power of direction or control, in which class of cases it has been held that when the servant is guilty of negligence, the special and not the general master is liable for damages resulting from such negligence. We do not think this case belongs in that class. In a luminous opinion by Mr. Justice Moody in Standard Oil Company v. Anderson, 29 Sup. Ct. Rep., 252, decided by the Supreme Court of the United States during the current year, the question under consideration was dealt with and decided. The facts of that case were as follows:

The plaintiff was employed as a longshoreman by one Torrence, a master stevedore, who, under contract with the defendant, was engaged in loading the ship Susquehanna with oil. The plaintiff was working in the hold, where, without fault on his part, he was struck and injured by a draft or load of cases containing oil, which was unexpectedly lowered. The ship was alongside a dock belonging to defendant, and the cases of oil were conveyed from the dock to the · hatch by hoisting them from the dock to a point over the hatch, whence they were lowered and guided into the hold. The work was done with great rapidity. The motive power was furnished by a steam winch and drum and the hoisting and lowering were accomplished by means of a tackle, guy rope and hoisting rope. The tackle and ropes were furnished and rigged by the stevedore, and the winch and drum were owned by the defendant and placed on its dock, some fifty feet distant from the hatch. All the work of loading was done by employes of the stevedore, except the operation of the winch, which was done by a winchman in the general employ of the defendant. The case was tried before a jury and the plaintiff had a verdict. The verdict establishes that the plaintiff was in the use of due care, and that his injuries were suffered by reason of the negligence of the winchman in improperly lowering the draft of cases into the fold.

The Supreme Court held that the winchman was, at the time the injuries were received, the servant of the defendant Standard Oil Company and not the servant of the stevedore. It was held that the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil, did not render the winchman the servant of the stevedore; and the court said: "The giving of the signals under the circumstances of this case was not the giving of orders, but of

information; and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there has been a change of masters."

In the case of Driscoll v. Towle, 181 Mass., 416, the question under consideration was considered and decided on the following state of facts:

"In that case the defendant was engaged in a general teaming business. He furnished a horse, wagon and driver to the Boston Electric Light Company. The driver reported to the electric light company and received directions as to what to do and where to go from an employe of that company, but at night returned the horse and wagon to the defendant's stable and received pay from the defendant. While traveling to carry out an order received from the company he negligently injured the plaintiff, who brought an action to recover for the injuries, alleging that the driver was the defendant's servant. It was held that there was evidence which would warrant the jury in finding that the driver continued to be the defendant's servant. It was said in the opinion of the court, delivered by Holmes, C. J.:

"But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books. . . .

"In this case the contract between the defendant and the electric light company was not stated in terms, but it fairly could have been found to have been an ordinary contract by the defendant to do his regular business by his servants in the common way. In all probability it was nothing more. Of course, in such cases, the party who employs the contractor indicates the work to be done, and in that sense controls the servant as he would control the contractor, if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and make the employer liable under the fiction that the act of the employed is his act." See also Sanford v. Standard Oil Co., 118 N. Y., 571, 16 Am. St. Rep., 787, 24 N. E., 313; Johnson v. Netherlands Am. Steam Nav. Co., 132 N. Y., 576, 30 N. E., 505; The Victoria, 69 Fed., 160; The Lisnacrieve, 87 Fed., 570; McGough v. Ropner, 87 Fed., 534; The Gladestry, 63 C. C. A., 198, 128 Fed., 591; The City of San Antonio, 75 C. C. A., 27, 143 Fed., 955.

There is testimony in the record which supports the several findings of the jury except perhaps the finding that the American District Telegraph Company of Texas was a subsidiary corporation, acting under the direction and control of the Western Union Telegraph Company; and the finding that Jesse Bond was riding his bicycle at an excessive rate of speed at the time he struck the plaintiff. In

view of the other facts found by the jury, the two referred to are not material. The testimony shows such acting together as rendered the two companies liable for the negligence of Jesse Bond, and the jury found (which finding is supported by testimony) that Jesse Bond was guilty of negligence in not keeping a proper lookout to prevent a collision with other persons.

No reversible error has been pointed out and the judgment is affirmed.

*Affirmed.*

Writ of error refused.