MAGNOLIA PETROLEUM CO. v. CITY OF PORT ARTHUR. (No. 418.)*

(Court of Civil Appeals of Texas. Beaumont. Feb. 13, 1919.)

1. TRIAL ☞396(4)—FINDINGS—REQUESTS.

Requested findings in conflict with trial court's findings, which were sustained by evidence, held properly refused.

2. SHIPPING ☞86(2) — COLLISION WITH CANAL BRIDGE—CONTRIBUTORY NEGLIGENCE.

In suit for damages due to collision of steamship with canal bridge of plaintiff city, erected pursuant to act of Congress, over a canal, the property of the United States, held that the trial court was justified in finding that plaintiff was not negligent in constructing bridge so that it inclined over canal, and in failing to have sufficient fender piling to protect it from a boat built as was the steamship.

3. SHIPPING ☞86(2) — COLLISION WITH CANAL BRIDGE—PROXIMATE CAUSE.

In suit for damages due to collision of steamship with bridge of plaintiff city, held that the trial court was justified in deciding against defendant, which owned and operated tug which attempted to tow steamship through the canal, on the question of proximate cause.

4. SHIPPING ☞86(2) — COLLISION WITH CANAL BRIDGE—NEGLIGENCE.

In suit for damages due to collision of steamship with bridge of plaintiff city, held that the trial court was justified in finding that defendant, owner of tug, represented to master of steamship that tug was competent to tow without assistance of another tug.

5. MASTER AND SERVANT ☞301(4) — COLLISION WITH BRIDGE—NEGLIGENCE OF TUG—RELATION OF PARTIES.

In suit for damages to canal bridge due to collision with steamship, held that contention that defendant, owner of tug, which attempted to tow steamship, was not liable for negligence of tug, in that tug was the special servant of steamship, so that relation of master and servant did not exist between defendant and the tug, could not be sustained.

6. SHIPPING ☞86(2)—INJURY TO CANAL BRIDGE—NEGLIGENCE—EVIDENCE.

In suit for damages due to collision of steamship with bridge of plaintiff city, held that the trial court was justified in finding that tug which attempted to tow steamship was negligent, and that defendant owner of tug was liable for damages due to destruction of bridge.

7. SHIPPING ☞86(3) — NEGLIGENT NAVIGATION—INJURY TO BRIDGE—SPECIAL DAMAGES—PLEADING.

In action for damages due to collision of steamship with canal bridge of plaintiff city, affording only means of access to its pleasure pier, the contract price between plaintiff and a third person for the use of the pier could not be recovered, there being no pleading to the effect that defendant knew of contract.

8. SHIPPING ☞86(3)—INJURY TO BRIDGE—DAMAGE—LOSS OF PROFITS.

In action for damages due to collision of steamship with canal bridge of plaintiff city, affording only means of access to pleasure pier, held that plaintiff's loss of profits from failure to operate pier was proximately caused by destruction of bridge, and could be recovered under proper pleadings and proof.

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

Suit by City of Port Arthur against the Magnolia Petroleum Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded in part and affirmed in part.

Minor & Minor and F. J. & C. T. Duff, all of Beaumont, for appellant.

A. W. Dycus, of Port Arthur, Jno. D. Grace, of New Orleans, La., and Crook, Lord, Lawhon & Ney, of Beaumont, for appellee.

WALKER, J. This is a suit by appellee against appellant for damages to appellee's bridge across the Port Arthur Ship Channel in the city of Port Arthur. The case was tried before the court without a jury, the court rendering judgment for the appellee for the damages to the bridge, and $3,000 for the loss of rents which the city would have received for the bridge and the pleasure pier but for its injury. On motion of appellant, the court filed the following findings of fact and conclusions of law:

"(1) That there is a canal, extending from Sabine Pass to the mouth of the Neches river,

in Jefferson county, Texas, known as the Sabine-Neches Canal, and sometimes called the Port Arthur Ship Canal, passing between the city of Port Arthur and Sabine Lake, and that said canal is the property of the United States government, and is a navigable water of the United States, and that the Neches river is likewise a navigable stream of the United States, and extends from said canal to the city of Beaumont.

"(2) That the plaintiff owns and maintains a lift bridge, which is situated in the city of Port Arthur, on said canal, and said bridge on and prior to the 24th day of April, 1916, furnished a means of crossing said canal and reaching what is known as the 'Pleasure Pier,' which is a body of land owned by plaintiff lying out in the Sabine Lake, and was the only means of crossing said canal by land. That said bridge had theretofore been erected under enactment of the Congress of the United States, upon and across land belonging to the United States and its departments, officers, and agents having charge of such matters, and said bridge, and the location of said bridge, had been approved by the Secretary of War of the United States, and by the chief of engineers of the United States army, as had been the plans, specifications, and details of said bridge, and the said bridge was a lawful structure, and was being operated in all respects agreeable to the usages and requirements of the government of the United States, and did not unlawfully, materially, or unnecessarily obstruct the navigation of said canal, and at the time of the collision in question was raised to its full height.

"(3) That the defendant owns and operates an oil refinery situated on the right bank of the Neches river, near the city of Beaumont, and on the 24th day of April, 1916, had loaded approximately 1,497,676 gallons of gasoline on the steamship Splendor from the docks of said refinery, which it had theretofore sold to the Standard Oil Company of New Jersey; that the said steamship was an ocean-going tank steamer, and was in length 410 feet, had a beam of 56 feet and 6 inches, and its gross tonnage was 6,570; the steamer was owned by a company or association of Genoa, Italy.

"(4) That the steamship Splendor could not be safely and properly navigated in the Neches river and in the said canal without the assistance of a tugboat with adequate power to tow and guide her along a safe course through the river and canal.

"(5) That the Magnolia Petroleum Company owned the steam tug Magnolia, which was about 94 feet in length, and had a draft of about 12 feet, and a horsepower of about 650, and on said date the defendant, Magnolia Petroleum Company, with its said tugboat undertook to tow and guide the course of and assist said steamship Splendor from its said dock near Beaumont, out to sea over the Neches river and said canal, and did so by one hawser attached to the forecastle head of the steamship through the forward port chock, and extended and fastened to the tugboat Magnolia on the main bitts at its stern; that said steam tug Magnolia during said time was operated by and under the control of the defendant, the Magnolia Petroleum Company, by and through Captain Thomas Fenlon, who was an agent and employé of the defendant, Magnolia Petroleum Company, in command of same as master of said tug, and he was

aided and assisted in handling said tug by the other officers and crew of said steam tug, and said tug had on board a full crew, who were likewise in the employ of said defendant, and who were at all times under the control and direction of said Captain Thomas Fenlon; and the defendant, if not expressly, at least impliedly, represented to the master of said steamship that said tug was competent to perform said undertaking without the assistance of another tug.

"(6) That the steamship Splendor had on board a pilot, employed by the steamer, a master, and a full crew of officers and men, who assisted and co-operated with the captain of the tugboat by means of whistle signals at times, touching the maneuvers in navigation, Captain Fenlon of the tugboat sometimes initiating and executing the movements and maneuvers of the tugboat without directions from the pilot or master of the steamship, and at other times carrying out the directions concerning the maneuvers in navigation as communicated by the pilot on the steamer, or the master of the steamer; that the steamship was usually propelled by her own engines, and her general management and control was under her master and the pilot on board.

"(7) That long before arriving at the said Sabine-Neches Canal, and while said steamship Splendor was being moved along the Neches river by the joint efforts of the officers and crew of said ship and of the tug Magnolia, the aforesaid Captain Thomas Fenlon, master of the tug Magnolia, observed that said steamship Splendor was in an improper trim, and, because of his years of experience as a water man and experienced navigator, he realized that in her said condition it would be almost impossible, if not absolutely impossible, to tow, direct, and guide the head of said steamship.

"(8) That the master of the tug Magnolia was confirmed in his opinion that it would be almost impossible, if not absolutely impossible, to control the course of said vessel, even before reaching the Sabine-Neches Canal, by reason of the vessel steering wildly; that is to say, the head of the steamship would swing off to sheer away from the course her officers and crew were endeavoring to hold her on; and, notwithstanding the watchfulness of the officers and crew of both vessels, the head of the steamship would sheer away, carrying the steamship towards one bank or the other against the best efforts of the Magnolia to tow and guide the head of said vessel.

"(9) That both in the Neches river and in the Sabine-Neches Canal the said steamship frequently ran hard into the bank because the towboat Magnolia was wholly unable to arrest the sheers of the steamship, or to prevent her from going into the banks of the canal whenever she commenced to sheer.

"(10) That the tug Magnolia was of sufficient power, her equipment sufficiently complete, and her officers and crew of sufficient knowledge and skill, to have successfully executed the service she undertook, to tow and guide the head of said steamship along said waterways on a course safe to both vessels as well as safe to the property of third persons in and along said waterways, if the said steamship had been in a normal condition, properly trimmed, so that her movements would be subject to control.

"(11) That the cargo and water ballast of the

said steamship Splendor was so distributed in her cargo and ballast tanks as to put this steamship in such an improper trim as to render her movements uncontrollable notwithstanding her own efforts and the efforts of the tug Magnolia and the officers and crews of said vessels; and the steamship, as she was moved along said waterways in this condition, was a manifest menace and an instrument of grave danger to the property of those on and along the banks of said waterways.

"(12) That Captain Thomas Fenlon, master of the said tug Magnolia, did from his personal observation of the said steamship and his experience as a waterman, his skill as an experienced navigator and his knowledge of the said waterways, realize, appreciate, and understand all the hazards and difficulties which would attend his efforts with the tug Magnolia to attempt to tow and guide the head of the said steamship down the Neches river and Sabine-Neches Canal to the sea. He knew these things when he entered upon that service, which was just after said steamship had gotten off the river bank in the Neches river, on which she had run up high and dry among the trees, while she was attempting to go down the said river. Captain Fenlon then knew, as an experienced navigator, that the ship was not in a proper trim, and that, as a consequence thereof, she would continue to prove unmanageable while in that trim, and that he would not be able to tow and guide the head of said vessel with only the tug Magnolia; and thereafter, while in the Neches river, well knowing and observing from the effect of each sheer to sheer taken by this steamship, that the best efforts of himself and the other officers and crew of said tug, and of the said tug Magnolia, to tow, guide, and direct the head of said steamship, were and would continue to be of no avail, and that the said tug was wholly unable and incapable of arresting the sheers of said steamship; but nevertheless, in spite of such knowledge, the said master of the tug Magnolia continued with the said tug Magnolia to attempt to tow, guide, and direct the head of said steamship down said river and canal and past the aforesaid bridge.

"(13) That after said steamship arrived in the Sabine-Neches Canal, and on account of the fact that her draft was almost equal to the depth of the canal, the vessel became more unmanageable, and repeatedly sheered into or ran against first one bank of the canal and then the other, steering wildly all the time, and the officers and crew of the tug Magnolia, with the said tug, were unable to prevent said steamship from so sheering, notwithstanding their repeated best efforts on each occasion to do so; that it then became all the more manifest to the master of the tug Magnolia that the tug, its officers and crew, could not possibly tow, guide, and control the head of this vessel, but they persisted in their fruitless efforts, and continued attempts to tow, guide, and control said steamship, as they had undertaken to do, along said canal and past defendant's said bridge.

"(14) That when this steamship was about one-half mile above plaintiff's bridge she sheered into the right bank of said canal, and upon being relieved of this situation she again started her uncertain course down this canal under the joint efforts of her crew and of the tug Magnolia and her crew. Still steering wildly, she proceeded on down to a distance of about 1,000 feet above said bridge, when she again sheered for the right bank, and the efforts of the tug Magnolia to stop this sheer resulted in parting the towline which extended from the head of this ship to the stern of the tug; but she failed in this effort as she had failed on repeated former occasions; the ship ran hard in and stuck fast on the right bank of the canal, narrowly missing dredge on which a number of people were at work, seriously endangering their lives. The tug Magnolia was brought by her officers and crew back to where the steamship Splendor was stopped, stuck fast in the bank, and immediately made preparations to continue this perilous voyage. A towline was again run out from the head of the ship to the stern of the tug, and, after the ship was again gotten off the bank, the tug again, by her master, officers, and crew, attempted their repeatedly futile efforts to tow and guide the head of said ship down this canal and past the bridge. That after the said steamship straightened out in the canal her engines were stopped, and she approached the bridge, moving forward only by the momentum given her by the tug. She had progressed but a short distance when the steamship Splendor sheered for the right bank of the canal and toward plaintiff's bridge.

"(15) That as the steamship Splendor sheered for the right bank, and towards plaintiff's bridge, the ship's engines were put in reverse motion, and the officers and crew of both the ship and tug used every reasonable effort in the face of an impending collision to prevent the ship from colliding with the bridge, but they were no more successful in their effort to stop this sheer than on the many previous occasions, when the ship ran into the banks of the river and canal; and the steamship Splendor crashed into plaintiff's bridge, injuring it in the manner and to the extent complained of by plaintiff.

"(16) From the foregoing facts the court finds that said Captain Fenlon, who was then and there the agent and representative of the defendant, Magnolia Petroleum Company, and acting in the scope of his authority in the matters intrusted to him by defendant, was not in the exercise of ordinary care, and was guilty of negligence in attempting to tow and guide the steamship Splendor along said canal and past said bridge in the manner aforesaid and under all the circumstances apparent to him, knowing at the time that the tug could not control the steamship, and that such negligence was the direct and proximate cause of said collision and the injuries to said bridge.

"(17) The court further finds that the collision in question was not the result of an inevitable accident, or from natural causes, and that the same was due to no intervening act or omission on the part of others, and the court finds that such collision was due to no negligent act or omission on the part of the plaintiff in any of the respects alleged by the defendant."

Appellant filed with the court below, and asked the court to approve the same, a large number of findings of fact and conclusions of law, some of which are in conflict with the findings made by the court. The court refused these findings of fact and conclusions of law, as prepared by appellant, to which

action of the court appellant excepted, and has appealed the case to this court for review.

We have carefully examined the statement of facts in this case, and conclude that all the findings of fact made by the trial court are amply sustained by the testimony, and we adopt these findings as made by the trial court as a part of our findings of fact.

The bridge described in the court's findings of fact was built so as to incline over the canal, when raised to its full height, at an angle of about 15 degrees from a perpendicular, and at the time the bridge was struck by the Splendor it was raised to its full height.

The city of Port Arthur had piling extending out from the bridge pier, but this piling was not sufficiently high to protect the bridge from a ship built as was the Splendor.

The steamship Splendor was owned by an Italian corporation of Genoa, Italy, the Standard Oil Company of New Jersey being either the charterer of the Splendor or the New York agents for her owners. Chas. Martin & Co. of Port Arthur, Tex., were the duly appointed and acting agents of the Splendor on the occasion of her voyage to and from the defendant's docks in April, 1916. Chas. Martin & Co., as such agents, before the arrival of the Splendor at Sabine Pass, on its voyage for defendant's docks in April, received from the Standard Oil Company of New Jersey two letters, one addressed to Chas. Martin & Co., and the other addressed in their care to Captain E. Scarpa, the master of the Splendor, these letters being as follows:

"Standard Oil Company, Incorporated in New Jersey.

"New York, March 27, 1916.

"Messrs. Charles Martin & Co., Port Arthur, Texas:

"Gentlemen: I beg to advise that the Italian S/S Splendor sailed from Messina on March 12th, p. m., for Beaumont, direct, where she is to load five tanks, about 32,000 bulk barrels, deodorized naphtha 64/65° Baumé gravity, balance of cargo, consisting of Standard White Oil, will be supplied at Baton Rouge. She should be due at your port, Beaumont, about April 2d, and you will kindly be on the lookout for her, giving the captain all necessary advice and assistance.

"I am forwarding a special letter to the captain giving him all the information and instructions necessary in regard to the navigation of the channel between Sabine and Beaumont.

"I beg to inclose bills of lading for the part cargo to be shipped from Beaumont. After steamer has finished loading, please fill in the number of gallons, also the numbers of the tanks containing the naphtha, as well as the hours consumed in loading.

"As in the case of the Lampo, this steamer should be loaded under the supervision of United States customs inspectors, and you will please obtain the necessary certificate, namely—

"Shipper's affidavit;

"Custom house affidavit;

"Certified manifest viséd by the British, French, and Italian consuls.

—and hand these documents to the captain before sailing. Should, however, the signatures of one of these consuls not be obtainable at Sabine, you can forward the respective documents to Mr. Rueff, and he can get the required consul's signature at New Orleans.

"Kindly also deliver to the captain the regular captain's copy of bill of lading, and the original bills of lading, with the request that he deliver the latter one to his company on his arrival. The two other B/Ldg. shipper's copy to be delivered to the refinery.

"Clear the Splendor for Savona via New Orleans, and notify Mr. George William Rueff at New Orleans as soon as the steamer sails from Sabine."

"March 27, 1916.

"Captain E. Scarpa, Italian S. S. Splendor, % Messrs. Chas. Martin & Co., Port Arthur, Texas.

"Dear Sir: From orders which we received from the Societa Italo-American Pel Petrolia, Genoa, your steamer is to load—

"5 tank, abt. 32,000 bulk bbls., deodorized Naphtha, balance of cargo abt. 19,000 bulk barrels refined petroleum (Standard White Oil).

"The naphtha portion of your steamer's cargo is to be supplied by the Magnolia Petroleum Company, Beaumont, Texas, after which you are to proceed to Baton Rouge, and there load the Refined Oil, Standard White, portion of your cargo and bunkers.

"With regard to loading the naphtha portion of your cargo at Beaumont, we are advised that the pilots although feeling quite sure that much larger vessels can navigate the channel, would prefer to test it out first with vessels 400 feet long and 23 feet draft.

"I can, of course, only ask that you take up with the pilots the matter of the navigation of the canal up to Beaumont, and satisfy yourself that it is a safe proposition for a steamer of the size of the Splendor, and particularly as she is only going to load a part cargo. You will, of course, advise the pilots of the length of your steamer, and the draft you expect to put her to when the naphtha is on board, and all further information for their guidance in handling the steamer.

"I understand that the Magnolia Petroleum Company have a tugboat in attendance for assisting steamers through the canal, the service of which will no doubt be available for your steamer."

As agents for the Splendor, Chas. Martin & Co. paid on behalf of the owners the pilot's fee of $185 for bringing the Splendor to the defendant's docks and taking her out to sea on this trip. Chas. Martin & Co., as such agents of the Splendor had an understanding with the defendant that it was to furnish one tug to bring the Splendor from the sea to Beaumont. The master of the Splendor, Chas. E. Scarpa, made no application to

Chas. Martin & Co. for an additional tug. Had he done so, the additional tug would have been furnished. The Splendor was only partially loaded at the docks of the defendant—the balance of the cargo was to be taken on at Baton Rouge, La. Capt. Scarpa had sole charge and direction of the loading, directing what tanks should be filled and what tanks should not be filled.

On April 24, 1916, at about noon, the Splendor, with Pilot Granger on board, a regular river and bar pilot, employed and paid by Chas. Martin & Co., the agents of the Splendor, and also having on board her master, E. Scarpa, with full complement of officers and crew, under her own power and using her own steering gear, left the defendant's docks, bound for Baton Rouge, La., and went down the river a mile or so without the assistance of any tug. She was overtaken by the tug Magnolia, belonging to the defendant, with instructions to assist the Splendor out to sea and to make no charge for such service. This same tug brought the Splendor in from the sea without any charge. Capt. Fenlon of the Magnolia went forward and took a line over the Splendor's bow, the line being furnished by the Splendor, and being fastened on the Splendor through her forward port chocks, and on to her bitts on her forecastle head, and to the main aft bitts of the tug, Capt. Scarpa testifying:

"I should judge that the length of the towline between the tug and the ship was about three hundred feet; two hundred and fifty feet perhaps it is. I relied on the Magnolia and her crew as to how the lines should be attached to the steamer and how they should be attached to the tug."

The speed of the Splendor was partly determined by orders from Capt. Scarpa and partly by Pilot Granger and partly by Capt. Fenlon of the tug Magnolia. Capt. Plummer, referring to Capt. Fenlon, says:

"He got his megaphone and hollered back to the pilot two or three times down the river that he would have to let go if they didn't slow down."

He further says:

"When we went into the shell pile and parted the rope there, and had the ship stopped right up against the bank, we could have left her there. That was about 1,500 feet above the bridge."

And also:

"With regard to whether there was any other times that Capt. Fenlon protested against the course the tow was pursuing down the river, he signaled to them he would have to let go if they did thus and so. That meant he would have to let go that towline and let her do just as she pleased on her own hook. I think they slowed down some when he threatened to leave the vessel if it wasn't properly handled. That was in the river."

Capt. Scarpa testified:

"As to whether the captain of the tug had any control over the engines of the Splendor, well, sometimes the captain of the tug would suggest to us to go slower, you understand, because when I told the pilot perhaps it is better to make half speed than slow speed, then the tug says to go slow, otherwise they cannot control the steamer."

The tug Magnolia was employed merely to assist the steamship Splendor. As the fleet went down the river into the canal, the Splendor was partly propelled by her own power and partly towed by the tug. At times Capt. Fenlon of the Magnolia directed the movements of the tug and of the Splendor. Capt. Scarpa testified:

"The pilot told me that the master of the tug was clever and thoroughly acquainted with the channel—better than he was, so he said—and that I could rely on his actions in the navigation of the ship down the channel. I certainly did so, in some measure. I had to, naturally. * * * He knew how to handle the steamer very well. He did not have to wait for the orders from the pilot, because he understands his work himself. I mean that in going down the canal he did not always wait for the pilot to give him his orders, but on his own motion and of his own volition he did what he thought ought to be done under the circumstances. He will use his own judgment, and his judgment is very good, too. I relied on him in a large measure, because the Magnolia Petroleum Company had promised to give us tugboat service, and I was counting on them doing it, and after that because I could judge his actions they were correct. In my opinion he was right in his maneuvers. When I saw he acted well I trusted him better and better. Seeing that his actions coincided with what I thought ought to be done in the situation, I learned to rely on the Magnolia doing the right things in navigating the boat down the channel. * * * The course and direction of those two vessels were determined by the pilot and given to the master of the tug boat by the pilot for the Splendor, and by the master of the tugboat, because he has such broad acquaintance with the river. He knows very well the river, and the master of the tug boat is thoroughly to be trusted, so the information is given to me by the pilot. I am told by the pilot to trust the master of the tugboat, because his business he knows very well, and he tells me that confidence is not to be lacking in the master of the tugboat at all. The movements and directions of the tugboat were sometimes determined by the pilot, and sometimes the master of the tugboat himself proceeded to make movements without any orders when he sees it is necessary."

The tugboat master, Thomas Fenlon, was a thoroughly competent and experienced tug master, well acquainted with assisting ships in the waters of the Neches river and the Sabine-Neches Canal and Port Arthur Ship Channel.

Pilot Granger and the master and crew of the Splendor were not employed by, or paid

by, the defendant, and they were the agents and servants of the Splendor. There is no evidence of any understanding or agreement between the defendant and the owners or agents of the Splendor as to tugboat service, other than as stated in the letters above copied, until the Splendor arrived at the mouth of the Sabine Pass, when there was an understanding between the defendant and Chas. Martin & Co. that the defendant would furnish a tug free of charge to bring the Splendor in and take her out. "After the Splendor took the sheer that brought her into collision with the bridge, neither the tug nor her master and crew could, by the exercise of any ordinary care and skill, have kept the Splendor from colliding with the bridge." (This last sentence is the thirty-fifth finding of fact requested by appellant.)

[1] All other findings of fact requested by appellant, except such as we have embodied in the statement above given, are in direct conflict with the findings of fact made by the trial court, and, as the findings of the trial court are sufficiently sustained by the record, we conclude that the court did not err in refusing to adopt appellant's findings of fact, nor in making the findings of fact as filed, and all assignments based on the court's failure and refusal to find the facts requested by appellant are overruled.

[2] By its fourth and fifth assignments of error appellant asserts the proposition that the city of Port Arthur was guilty of contributory negligence in building the bridge so that it inclined over the canal, when raised for vessels to pass through, and in failing to have sufficient fender piling to protect the bridge from a boat built as was the Splendor.

In the statement heretofore made of this case the bridge is described and the arrangement of the fender piling. Appellant cites City of Richmond (D. C.) 43 Fed. 88; Edgerton v. The Mayor, 27 Fed. 232; Railway Co. v. Railway Co., 59 Fed. 192, 8 C. C. A. 86.

In the City of Richmond the damage grew out of the ship breaking the cable of the Western Union Telegraph Company, which was laid across the waters of the North river. The Western Union Telegraph Company was held liable for damages in this case, because its cable was not laid according to the act of Congress authorizing the same.

In Edgerton v. The Mayor, supra, the accident grew out of the fact that the bridge was not opened to its full width. The negligence in this case is predicated on an entirely different ground from the facts in the instant case. In the Edgerton Case it is not shown that the vessel was negligently navigated, but, on the contrary, it appears that the accident was caused by conditions over which the ship had no control.

In Railway Co. v. Railway Co., supra, the court said:

"In the present case those in charge of the tug navigated her with all reasonable care, supposing, as they had a right to, that the draw would be opened seasonably to permit the tug and her tow to pass."

This case was decided on a proposition of law different from the one involved in the facts of the instant case.

[3] The most that can be said from the standpoint of appellant in the case under consideration is that the question of negligence was an issue of fact, to be decided by the trial court, as likewise the question of proximate cause. The court, trying this case without a jury, has decided both of these issues against appellant, and under the testimony in this record this finding should not be disturbed.

Where both plaintiff and defendant are negligent, Judge Yantis said in Wells Fargo & Co. v. Benjamin, 107 Tex. 331, 179 S. W. 513:

"If each party to the suit was guilty of negligence, then it became a question for the jury to determine, the trial being had before a jury, whose negligence proximately caused the injury. * * * One's act is only a proximate cause of an injury when it could have been reasonably anticipated by him that some such injury would result from such act."

In deference to appellant's sixth assignment of error, we have found the facts to be as claimed by appellant, and have stated these facts in the statement of this case. Appellant's seventh assignment of error is not well taken. In this appellant complains because the court did not find that no protest was made by the master of the Splendor to the defendant against the use of one tug only.

Capt. Scarpa of the Splendor testified:

"As to whether I suggested to the Magnolia Petroleum Company, after I got to Beaumont, or at any time, that I should have more than one tug, well, I suggested it you know when I was up there in Beaumont; but they told me that the Magnolia was strong enough, you understand, and that it was the only one there. I told them it was better that we should have two tugboats, and then they told me that they had sent three other steamers down with just that one boat. I relied on their judgment in that respect. I was looking to them to furnish me tugboat service, and I respected their judgment in that particular, because they told me they had sent the Lampo down with that tug—the Lampo, you understand, is a sister ship to this —and she had a good passage with one tug; and so, of course, I did not insist that we should have the two tugs. It was my judgment that two tugs would have been better. That was my personal judgment; that would not have been too much. I cannot say that with the assistance of another tug or two more, I could have held that ship off of the bridge; it would have been more likely, certainly."

[4] This testimony was not objected to by appellant on the ground that Capt. Scarpa

names no officer of the defendant to whom this protest was made. The court's fifth finding of fact on this issue, we think, is sustained by sufficient testimony.

In our statement of the case we have found the facts requested by appellant in the eighth and ninth assignment of error.

[5] Appellant's tenth assignment of error is as follows:

"The court erred in rendering judgment for plaintiff, and in refusing to render judgment for the defendant, and in failing to conclude and hold that the trim of the Splendor, whether by the distribution of her cargo or of water ballast, was a matter within the absolute control of Pilot Granger and the Splendor's master, and as to that question neither the defendant nor the tug nor the tug master had any voice or control, and for which neither the tug nor its master was responsible, nor the defendant liable, the tug being a mere helper or assistant of the Splendor, subject to the orders of Pilot Granger and the Splendor's master, being the mere servant of the Splendor, with no will of its own, but bound to obey orders from the pilot and master of the Splendor, there being no part of the responsibility of the navigation of the Splendor on the tug or its operators to correct or regulate the trim of the Splendor, under the exclusive control of whose pilot and master she was."

Under this assignment appellant advances the proposition that the Splendor was the special master of the tug, and the tug was the special servant of the Splendor, and hence the relation of master and servant did not exist between the defendant and the tug, and the defendant was not liable for the negligence, if any, of the tug, in towing the Splendor down the canal. In support of this assignment appellant cites Byrne v. Kansas City Ry., 61 Fed. 605, 9 C. C. A. 666, 24 L. R. A. 693; Clark v. Geer, 86 Fed. 447, 32 C. C. A. 295. These authorities, especially Byrne v. Railway Co., supra, sustain this legal proposition. We have carefully examined the Texas cases cited by appellant, to wit, Cunningham v. I. & G. N. Railway Co., 51 Tex. 503, 32 Am. Rep. 632; Burton v. G. H. & S. A. Ry. Co., 61 Tex. 535; Railway Co. v. Flake, 1 White & W. Civ. Cas. Ct. App. § 253; Southern Oil Co. v. Church, 32 Tex. Civ. App. 325, 74 S. W. 797, 75 S. W. 817; Railway Co. v. Ferch, 36 S. W. 488; Railway Co. v. Couch, 56 Tex. Civ. App. 336, 121 S. W. 191—and do not consider them in point on this proposition. These Texas cases are decided on the theory that a railway company, on the facts stated, was not liable for the negligence of an independent contractor.

As we construe the decisions of our courts, in Western Union Telegraph Co. v. Rust, 55 Tex. Civ. App. 359, 120 S. W. 249, and Manning v. B. S. L. & W. Ry. Co., 107 Tex. 546, 181 S. W. 687, they have followed Standard Oil Co. v. Edward Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480. Judge Moody, after reviewing many authorities pro and con, announces the following rule:

"But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign—as the master sometimes was called in the old books. * * * But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employé is his act."

In Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591, the following rule is announced:

"By employing a tug to transport their vessel from one point to another, the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service. They neither appoint the master of the tug or ship the crew; nor can they displace either the one or the other. Their contract for the service, even though it was negotiated with the master, is, in legal contemplation, made with the owners of the vessel; and the master of the tug, notwithstanding the contract was negotiated with him, continues to be the agent of the owners of his own vessel, and they are responsible for his acts in her navigation."

Under the tenth assignment appellant asserts the further proposition that, if the bridge was injured by a negligent act, it was the negligence of the steamship Splendor, and not the negligence of the tugboat; that the tugboat was only the servant of the Splendor, and was compelled to obey all orders from the Splendor, and in so doing it is guilty of no actionable negligence.

Appellant has cited many authorities under this proposition, and, if the trial court had not found that the tug was guilty of negligence, these authorities would be in point, and would sustain this proposition. But by the seventh, eighth, twelfth, and sixteenth findings of fact, supra, the court finds that the tug was guilty of negligence, and states the facts on which he bases this conclusion.

[6] On the facts found by the trial court, was he justified in concluding that the tug was negligent, and that the defendant was liable for such negligence?

In discussing the liability of the tow, the following rule is announced in 11 Corpus Juris, p. 1084:

"She is liable where she might have prevented a collision by timely action in the management of her own helm, or where she consented to the

navigation at such time and under such conditions as to make it dangerous, thereby contributing to a collision."

The same principle of law, making the tow liable, would certainly make the tug liable, where she assisted in the navigation at such time or under such conditions as to make it dangerous. Certainly, Capt. Fenlon knew that the navigation of this ship was very dangerous.

The following rule is announced in Am. & Eng. Ency. of Law, vol. 25, p. 933, to wit:

"She is in fault as against innocent third vessels in towing a vessel which is unmanageable, though the tow, under such circumstances, is also in fault."

And on page 937 it is said:

"The towing vessel will be held in fault as against a third vessel for towing a vessel which displays the wrong lights."

In Sturgis v. Boyer, 24 How. 121, 16 L. Ed. 591, the Supreme Court said:

"Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision; as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation."

In The James Gray, 21 How. 192, 16 L. Ed. 106, the court said:

"It was especially the duty of the officer in command of the steamboat, in a crowded harbor like that, when his tow was following him at the rate of six or seven miles an hour, and her course necessarily directed by the steamtug, to have scanned carefully the surrounding objects before he cast loose the towline, and to see that there was nothing in the way of the tow which she could not avoid by means of her own rudder, without the aid of the steamboat, and also to have given reasonable notice of his intention, in order that she might prepare to take care of herself. But this was not done. He suddenly let go the towing line, without notice or warning to the John Fraser. And the moment after he had done so, and not before, he found his own vessel almost aboard of a vessel at anchor, and the head of the John Fraser, under the direction and impulse his ship had given her, directed upon the anchored vessel, and too near to avoid a collision when she had lost the aid of the General Clinch."

In The W. J. Keyser, 56 Fed. 734, 6 C. C. A. 104, it is said:

"It is further contended that, if the tug was not wholly responsible for the tow, she was culpable, concurrently with the libelant, in taking the barge to sea with open spaces on her deck, when heavy weather was to be expected. It has been repeatedly held that where a tug undertakes the towage of a boat known to both the owner of the tow and the tug to be unfit and unseaworthy for the voyage contemplated, and a loss occurs in the ordinary contingencies of the voyage, to which the unfitness and unsea-worthiness contribute, both should be held in fault."

In The Percy Birdsall (D. C.) 55 Fed. 683, it is said:

"I find both the tug and ship to have been negligent; the former in running with her unwieldy tow so far westward in the channel, and in approaching so near the schooner before turning off; and the ship in failing to change her course and follow the tug until collision was inevitable. The evidence fully justifies a belief that the latter was negligently handled. The warning of her lookout was not promptly heeded. She seems to have virtually committed herself to the guidance of the tug, and to have paid little attention to the latter's movements. The fact that the ship was very heavy and the tug's control of her, at the end of a long hawser, very imperfect, imposed on both unusual vigilance, and rendered the duty of keeping well over to the eastward the more imperative. I will not discuss the evidence; it is sufficient to indicate my reasons for the conclusions reached."

In The Civilta v. Perry, 103 U. S. 699, 26 L. Ed. 599, the Supreme Court said:

"Both vessels [the tug and the tow] were responsible for the navigation, as has been already seen; the ship because her pilot was in general charge, and the tug because of the duty which rested on her to act upon her own responsibility in the situation in which she was placed. The tug was at fault because she did not on her own motion change her course so as to keep both herself and the ship out of the way."

If we have correctly analyzed the decisions quoted above, then, on the facts found by the trial court, the defendant, as the owner of the tug, is liable for the damages suffered by appellee in the injuries to its bridge.

Appellant's second assignment of error is as follows:

"The court erred in overruling defendant's special exception No. IV to plaintiff's petition, contained in defendant's first amended original answer, said special exception being to said petition where it seeks to recover the rental value of the Pleasure Pier, alleged to be $3,000, because too remote."

Appellee alleged in its petition that the bridge was the only means of crossing the canal from the city to the Pleasure Pier, and further alleged:

"Plaintiff further alleges that the said Pleasure Pier is used by the plaintiff as a public resort as well as for other purposes, where great numbers of persons go for amusement and pleasure, and the plaintiff leases the said Pleasure Pier for the purpose of maintaining a pleasure resort for its inhabitants and the public generally, and from this source it received a revenue of $3,000 per year, and would have received that much for the year of 1916 but for the destruction of said bridge, but on account thereof it has lost the value of the use of said Pleasure Pier in the sum of $3,000, because

the said Pleasure Pier has no rental value without the said bridge which furnished the only means of ingress and egress, and by reason thereof the plaintiff has been further damaged in the sum of $3,000, or the reasonable rental value of said Pleasure Pier with the said bridge.

"That all of the injuries to said bridge, and the consequent damages to the plaintiff is the direct and proximate result of the acts of negligence herein complained of."

[7] Plaintiff offered in evidence the contract between it and C. E. Dunstan. Under this contract the city was to receive $3,000 annual rental for the Pleasure Pier and the bridge and other property described in the contract. This Pleasure Pier was about 2,000 feet from the bridge.

Capt. Fenlon testified:

"I began navigating this canal at the opening. The first vessel came up on March 22, 1916. I brought her up. * * * There is a dance pavilion, some kind of a scenic railway and a roller coaster on the pleasure pier. I know it is maintained as a pleasure resort for the city of Port Arthur. I have been out there a few times. I knew that from the time I came into that city. I knew that the bridge furnished the only means over the water to that pier."

The contract further provided that, if the bridge was injured so it would not be operated, the city was to allow Dunstan a credit of $20 per day. Under this contract the plaintiff was not able to collect any rent during the year 1916.

The court, on this pleading and under these facts, rendered judgment for plaintiff for $3,000 damages, basing the damages on this contract.

We think the court was in error in not sustaining the special exception which is the basis of this assignment.

Under the pleadings of plaintiff this damage was too remote. There is no pleading to the effect that the defendant knew anything about this contract, either actually or constructively, or was put on notice of the existence of the contract. Clearly, under this statement of the record, the contract price between plaintiff and C. E. Dunstan for the use of the Pleasure Pier could not be recovered by plaintiff.

[8] However, we believe that plaintiff's loss of profit, if any, from the failure to operate the Pleasure Pier, was proximately caused by the destruction of this bridge, and under proper pleadings and proof the same can be recovered. City of San Antonio v. Royal, 16 S. W. 1101; Ry. Co. v. Miller, 38 S. W. 1132; Ry. Co. v. Baudat, 21 Tex. Civ. App. 236, 242, 51 S. W. 541; Ry. Co. v. Lackey, 12 Tex. Civ. App. 229, 33 S. W. 768; Ry. Co. v. Capers, 33 Tex. Civ. App. 283, 77 S. W. 39.

The trial court ruled correctly in overruling all other special exceptions to plaintiff's pleading.

For the error indicated, this cause is reversed and remanded as to the $3,000 damages allowed for loss of profits from the Pleasure Pier, and in all other respects it is affirmed.

⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes