GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v. J. BAUDAT.

Decided May 18, 1899.

1. **Public Road—Dedication—Acceptance—Presumption.**

From long and continued use of a road by the public (fifty years in this case), a presumption arises that such use of the land was acquired under the right of eminent domain, and it is not necessary to show by direct evidence an acceptance of a dedication of the land as a public highway.

2. **Same—Acceptance Implied When.**

Acceptance by the proper authorities may be implied from the use of the road for so long a period of time, and its having been worked, its beneficial nature, and the general reputation that it was a public road.

3. **Same—Prescriptive Right Not Defeated.**

A prescriptive right in the public to have a road kept open will not be defeated by the fact that the principal use of the road has become beneficial to only one person.

4. **Same—Easement—Railroad Right of Way.**

The easement of the public in a highway, as against the owner of the fee, is not affected by the construction of a railroad across it before limitation by prescription is complete, since the railroad does not take the fee.

5. **Same—Estoppel Against Railway Company—Crossing.**

When a railroad company has for forty years recognized and acquiesced in the claim that a given road is a public highway by maintaining a public crossing over it, this is conclusive against it as to such claim and right.

6. **Same—Damages Against Railway Company.**

A railway company is liable to a gardener who, by reason of the shutting up by the railway company of a public road which passed his place, is prevented from

properly marketing his produce either by hauling it away or by selling to customers who call for it at his garden, and damages for such loss of profits are not too remote.

**7.  Same.**

The gardener was justified in putting in his crop for another year after the crossing was closed and upon the assumption that he would have a way for marketing it, as it was not to be presumed that the railroad would continue its wrongful act in keeping the crossing closed.

APPEAL from Fort Bend.  Tried below before Hon. T. S. Reese.

*Pearson & Wharton* and *A. L. Jackson,* for appellant.

*Spencer C. Russell,* for appellee.

GARRETT, CHIEF JUSTICE.—The appellee brought this action against the appellant for the recovery of damages on account of the closing by appellant of the crossing over its railway track of a road leading from the appellee's premises over the railway into a public road running from the town of Richmond towards the city of Houston.  The damages claimed were for injury to the business of appellee as a truck farmer in preventing him from getting his produce to market, and in the prevention of access to his farm by his customers.  A trial by the court without a jury resulted in a judgment in favor of the appellee for the sum of $750.  The court filed conclusion of fact, which we adopt, as supported by evidence, as follows, striking out such as we deem immaterial:

"The plaintiff, J. Baudat, owns a piece of land about one and one-half miles from the town of Richmond upon which he lives.  His business is that of a truck farmer or market gardener and he is, and has been since he has been living on this place, engaged in that business, in a small way at first, but since about 1890 rather largely for this country, gradually increasing his business.  He has had since 1892 or 1893 about 100 acres in cultivation in all kinds of vegetables, which he disposes of by shipping to various places, by selling to customers in Richmond, and to persons who came on the place and bought in various quantities, from a nickel's worth to a wagon load, the larger quantities being bought of him and hauled to Houston for sale, and this last being a very lucrative trade. Plaintiff rented the land in 1887 and lived on it as a tenant until he bought in 1890, and has continuously lived on this place and carried on this business since 1887.  The place was visited by a great many persons, some to buy vegetables and many attracted by the sight (novel to this country) of a garden on so large a scale.  The cultivated land ran down to within 75 or 100 yards of the defendant's track at the crossing in question, and his residence was about 600 yards from said point in the field or cultivated land.  Ingress and egress to and from plaintiff's home and premises was along and over a roadway through his land to its northern boundary, thence across the narrow strip belonging to Ryan to the line of defendant's right of way, and thence across defendant's right of way and track, over the crossing in question, on to a junction with a

public road or highway, and running along the north side of the defendant's right of way and leading from the town of Richmond east. * * *

"The defendant's railway was built in 1854. At that time, and prior to that, as far back as 1843, this road on the north line of defendant's track and right of way had run from Richmond along its present location up to a point opposite the crossing; thence it turned south and ran across what is now defendant's right of way at the crossing in question a short distance, where it forked, one branch going off to the left down the river on the east, the other branch running south along the present road through plaintiff's land to a gin and mill on the east bank of the river, and thence up the river to a ferry just below the town of Richmond. The road over, at, and from the crossing in question through plaintiff's land and up to his residence follows the same track as the present road. The country was all uninclosed, uncleared, wooded land and cane brake, and this road as described was cut out through the timber and cane brake and was used by the traveling public as a public road in all respects, though there is no evidence that it was ever laid off and opened by the proper authority as a public road. When the defendant's railroad was built a regular crossing was built at the point where the road crossed the track and at the same point where the present crossing is located, and this crossing was kept up and maintained by defendant in all respects as a public crossing until 1894, when it was closed by defendant. *. * * In 1884 defendant fenced its right of way but left this crossing open, erecting the necessary cattle guards, as in case of other public crossings, but without signal posts for whistling.

"By permission of the defendant, Ryan, who owned a strip of land along the right of way up to the crossing and between the right of way and plaintiff's land, was allowed to put in gates on both sides of the crossing to keep his stock in his pasture. In 1865 the mill and gin aforesaid on the river was moved away and about the same time the ferry was discontinued, and there being no occasion for the public generally to use the road, it was not much used except by persons living in that bend of the river. This land was afterwards fenced up and the lands in the bend put in cultivation, but gates were put upon this road, and so far as necessary the public use of the road continued and as far as up to plaintiff's residence has always continued, though beyond that point there does not appear to have been any use of the road as a public road for possibly twenty-five years. * * * The road in dispute, that is from and through plaintiff's land across the railway at the crossing in question, was cut out through timber and cane brake, and continuously used and recognized as a public road, as it is now laid out, by the general public from 1843 (and prior thereto) up to the present time, except the time its use was prevented by the closing of the crossing by defendant in 1894. From the time of the building of the railway in 1854 up to 1894 a crossing where the road crossed the defendant's railway (being the crossing in question) was kept up and maintained in all respects as a public crossing by the defendant company and such crossing was used by the general

public, traveling these roads, as a public crossing without question, let, or hindrance until 1894. When plaintiff bought the land and established his present business in 1890 he regarded this road and crossing as a public road and crossing. There was no other public outlet from his place. This road and crossing afforded a good road and convenient means of ingress and egress to and from his place, increasing the value of his property very largely for his business and operated as a prominent inducement in the purchase of the place and establishment of this business. From the extent and nature of plaintiff's business and the proximity of his place to the railroad, I conclude that it was known to defendant's agents and servants, and that they may be said to have had knowledge of such business and of the probable damage to him in his business resulting from the closing of the crossing, and I find as a fact from the evidence that they had such knowledge. In 1894 the defendant's agents required plaintiff, as a condition for keeping the crossing open, to sign a contract to keep the gates, put there by Ryan with defendant's permission, as aforesaid, closed, and to be responsible for all stock killed at the crossing by the cars. This plaintiff refused to do, on the grounds that the crossing was a public crossing and the defendant had no right to impose any condition upon which it should be kept open. Defendant thereupon closed the crossing by fencing it up. * * * There was a private way in and out to and from plaintiff's place, through the inclosed and cultivated land of his neighbor Pleasants. This road or way has two gates and a pair of bars on it, the gates being sometimes locked. Plaintiff had permission from the owner of the land to use this way at will. The distance from plaintiff's premises to Richmond by this way was a little shorter than by the public road aforesaid, but it was merely a turn-row road through a plowed and cultivated field, rough and inconvenient to travel, and had several bad places. Plaintiff could not haul as many loads in a day and as much at a load as by the public road, and in addition, on account of the roughness, his produce was bruised and rendered less valuable and less fit for shipment. In addition to this, this way was inconvenient to persons coming to the place to buy; that such trade was entirely lost to plaintiff while the crossing was closed as aforesaid. But under these circumstances plaintiff marketed a large part of his crops in 1894 and 1895, using this private way, but at increased expense and great inconvenience, and at an additional loss on account of the roughness of the way.

"Plaintiff had growing on his land when the crossing was closed in July, 1894, about ten acres of watermelons, and about that time planted five or six acres in beans and about the same amount of cabbage (he had also other vegetables in smaller quantities). He planted some of these after the crossing was closed, because he expected the defendant would open the crossing. The watermelons, if they could have been marketed, would have realized about $100 an acre. The cabbages about $150 or $200 per acre, and the beans about $75 per acre. In 1895 plaintiff, still thinking the crossing would be opened, planted and raised during the

year, besides small vegetables, twelve or thirteen acres of beans worth $100 per acre, six acres cabbages, $200 per acre; potatoes, eight or ten acres, $75 per acre, and about one acre of tomatoes, worth $150. A large percentage in value of these crops was lost to plaintiff on account of his being unable to get them to market conveniently and in good shape, and on account of buyers not being able to get to the place conveniently. From the evidence I can not find with any certainty what the amount of this loss was, but from the best evidence I make, I find the damages to plaintiff to be $750, of which $250 was for crops growing when the crossing was closed, and $500 for crops planted after the crossing was closed; said crops having been planted under the belief that the crossing would be opened by defendant and that the plaintiff would be able to market them over the public road in question.

I find that the above loss and damage was the proximate result of the acts of defendant in closing the crossing in 1894 and keeping it closed until October, 1895. I find that the public road in question over the said crossing was a good, level, smooth road, free from any bad places all the way from plaintiff's place to Richmond, and that the private way through Pleasants' field was hardly a road at all, but merely a turn-row, a part of the way rough and inconvenient, and that plaintiff could not haul as much at a load, nor as many loads in a day by about half, as over the other road, and that in addition the vegetables were bruised and rendered less valuable, and their value impaired by hauling over the road."

It appeared from the evidence that the road in question leading south from the Richmond public road over the land now owned by the appellee and down into the bend of the river was cut out through the forest and cane brake many years ago, and used as a wagon road by the public generally; and that it adhered and was confined to the route as originally cut out, and from appellee's residence to the Richmond road, as now used, it has never been changed. Worthington, a witness for the appellee, testified that when he came to Texas, in 1849, the road was then used as a public road and looked upon as such; that he supposed it was worked by a road overseer, but did not know; that some one worked it. Access to the appellee's premises from the direction of Houston was cut off by the closing of the crossing, and his only outlet was through the Pleasants field in the direction of Richmond.

The trial judge concluded as matter of law that the road was not only a public road, but that the appellant was estopped from closing the crossing by its acts with regard to the same, which were, that when appellee bought the land it was maintaining a crossing over its track for the road with knowledge of appellee's intended use of the land. We do not think that the appellant was estopped from closing the crossing from the facts stated. But we are of the opinion that the conclusion that the road is a public road is correct and must be sustained. It became a public road by prescription as well as by dedication and acceptance. Hall v. City of Austin, 20 Texas Civ. App., 50; Elliot on Roads, 7, 91, 121, 123, 126, 134, 139, 140.

From the long and continuous use of the road, cut out as it was through the forest and cane brakes and confined by the character of the country to a single path, the presumption arises that at some antecedent time the land was acquired under the right of eminent domain, and, this being the case, it would not be necessary to show by direct evidence an acceptance of a dedication of the land as a public highway. We quote from Elliott on Roads and Streets, at page 134: "When the use of the way has continued for the period prescribed by the statute, or for the period designated by the common law authorities as from a time immemorial, there exists a right by prescription, founded, as Chief Justice Shaw says, upon the presumption that the way was at some anterior period laid out and established by competent authority." Citing Reed v. Northfield, 13 Pick., 94. A prescriptive right in the public to have the road kept open would not be defeated by the principal use of the road having become beneficial only to the appellee. The authorities to the effect that dedication will not be presumed of roads running over uncultivated and unenclosed lands are not applicable to the facts of this case. The right of the public to have the road kept open by prescription is complete, but from the evidence in the case dedication and an acceptance thereof may also be implied. Acceptance by the proper authorities may be implied from the use of the road for so long a period of time and its having been worked, as appears from the testimony of Worthington, its beneficial nature, and the general reputation that it was a public road. Elliott on Roads and Streets, pp. 115-117. The author cited sums up by saying that "it may now be considered as the prevailing opinion, that an acceptance may be implied from a general and long continued use by the public as of right." From the year 1843 up to the close of the war between the States, more than twenty years, the use of the road was more extensive than since, but its use has always been general. The road has never been abandoned except as to that part of it south of the appellee's residence. There is nothing in the contention that the easement for the road could not be acquired over the appellant's right of way, which is of itself only an easement. When the appellant acquired its right of way the road was already laid out over the land, and it was bound by law to restore the road to its former condition and put in the crossing. The easement for the road was acquired as against the owner of the fee of the land, and such would have been the case although the right of prescription had not become complete when the railroad was built. The right of the public by prescription has certainly matured since, and the acquiesence in and recognition of the appellant in this right of the public to the crossing for so long a time is conclusive against it as to this right.

Admission of testimony upon the question of damages is complained of. Since the case was tried by the court without a jury, and there is sufficient evidence to support the finding of the court as to damages, it becomes unnecessary to inquire whether or not the evidence, the admission of which has been assigned as error, should have been received. As a rule, however, proof of the loss of possible profits of a business is not ad-

missible. Appellee would not have been justified by the rule that would prevent one from allowing damages to accumulate in not planting his crop for the year 1895. It could not be presumed that the appellant would continue its wrongful act of keeping the crossing closed. The matter was entirely within its control and it could have opened the crossing at any time. Appellant's act in closing the crossing was wrongful, and it became liable to the appellee for all damages to him that naturally flowed therefrom. It will be readily seen that damages did result. It was not necessary that the appellant should be able to contemplate just what the damage would be. Its servants and agents knew that the appellee was being shut off by their act from convenient access to market and to the town of Richmond and elsewhere, and that he would probably suffer damage by reason thereof. The measure of damages in the case can not be arrived at with much degree of accuracy, but it is our opinion that the court below was correct in considering what the loss would be by hearing evidence to show probable loss of sales of the appellee's produce. It was shown by the evidence, in comparison with other years, before and after, that the sales were greatly reduced. Not only this, but the appellee could estimate, with some degree of accuracy, how much of the particular crops was lost to him by reason of convenient access to market having been closed against him. The evidence sustains the conclusion reached by the trial judge, and the damage is not too speculative and remote to prevent a recovery. The judgment of the court below will be affirmed.

*Affirmed.*

Writ of error refused.