TEXAS & P. RY. CO. v. PHILLIPS et ux.
(No. 3302.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 15, 1926. Rehearing Denied Dec. 30, 1926.)

1. Easements ⊛36(3)—Evidence held to show that railroad crossing was not used adverse to railroad's rights for statutory period.

Evidence *held* to show, as matter of law, that crossing over railroad was not used adverse to continuing rights of railway for statutory period of 10 years, where it was maintained by railway for use of tie contractors.

2. Easements ⊛36(1)—Plaintiffs seeking to compel railroad to maintain crossing must show right by prescription over it.

In suit to compel railway company to open and maintain crossing over its tracks and right of way, plaintiffs *held* to have burden to establish right by prescription over crossing.

3. Easements ⊛8(2, 3)—Permissive use of passway over railroad tracks and right of way does not ripen into right by prescription.

Where circumstances indicate permissive use of passway over railroad tracks and right of way as mere privilege, such character of use does not ripen into right by prescription, though continued for 10 years or more.

4. Easements ⊛8(1)—To obtain right by prescription to passway over railroad, use must be accompanied by claim of right or of adverse enjoyment.

In order to obtain right by prescription to passway over railroad, circumstances attending its use must show that such use was accompanied by claim of right or intention to enjoy it adverse and hostile to railroad.

Appeal from District Court, Lamar County; Newman Phillips, Judge.

Suit by J. T. Phillips and wife against the Texas & Pacific Railway Company. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

J. T. Phillips and his wife sought by injunction to compel the railway company to open and maintain a crossing over its track and right of way at a point about three miles east of Detroit and near to their farm, they claiming to have acquired a right by prescription to the continued use of the particular crossing as a road or passway. The plaintiffs' claim was founded solely on the allegation that they had acquired an easement in a particular roadway, running north and south from and through their land, and over the right of way and track of the railway company, to public highway No. 5, and which was completely obstructed and destroyed by the closing of the railway crossing in question, and that they had acquired this easement by prescription. They did not claim

that they had no other means of access to the public highway than this way. There are other ways that the plaintiffs can use to reach the highway. Special damages were also asked for in virtue of alleged wrongful obstruction of a right of way. The railway company specially denied any right in the plaintiffs by prescription, or otherwise, to use the track and right of way as a passway or roadway. The defense is founded, in effect, upon the claim that the crossing was established and maintained for the railway company's own convenience, to the knowledge of the public and the appellees. The case was submitted to the jury on special issues, and in keeping with the verdict the court entered judgment granting a mandatory injunction, directing the railway company to open and maintain the crossing, and awarding the plaintiffs the sum of $50 as special damages. The railway company timely requested a peremptory instruction, which was refused by the court.

The evidence is practically without dispute concerning the essential facts. Mrs. Phillips in her separate right is the owner of a tract of land, consisting of 110 acres, situated three miles east of Detroit. The land lies in a square adjacent to and wholly north of the railway right of way. The railway runs east and west. Immediately south of the railway, and running parallel with the track, is highway No. 5, a publicly dedicated highway lately constructed. Immediately west of Mrs. Phillips' land, and running with the west line north and south to said highway, is a public county road. This road crosses the railway track. The land bordering on highway No. 5 on the south at the place in suit is fenced and in cultivation, and has been for a long time. The appellant's line of railway, extending from Clarksville west via Detroit to Paris, was built in the year 1875. At this time all the land three miles east of Detroit, both north and south of the railway line, "was in woods," open and unused by the owners thereof. Mrs. Phillips purchased her tract in 1901, and at the date of the purchase "it was simply woodland, not a foot in cultivation." The land north of her tract, reaching to a considerable distance, was in woods. In 1902 Mr. and Mrs. Phillips built a house on the south end of the land, and moved into it, and had the land cleared and fenced. A lane running in front of the house was made through the center of the tract, running north and south. They have resided on the land since said date. Through the land is a roadway; and it is this roadway from and through appellees' land, and passing over the railway track at the crossing to highway No. 5, that is in controversy. It is admittedly shown that this road through the lane was never a road, dedicated as such by the owners of the land or established by the commissioners' court. As admitted:

"There was no public road ever established by the commissioners' court (leading) over the crossing or northward or southward from it."

Further, as admitted, "there was no labor done" by the plaintiffs or the public at any time on this roadway, north or south of the railway track. Prior to the construction of the railway, and for some time since, the precise date not given, there was no road, public or private, running east and west with or near the railway line at this place. At the time the railway was constructed in 1875, a tie yard was established by the railway company on its right of way, north of the track. The tie contractors stacked and delivered cross-ties sold to the railway company for its use, and the ties were received and taken up from contractors by the railway company at this point. At the same time the tie yard was established, the railway company threw up and thereafter continuously kept open and maintained a crossing over the track. The crossing was a necessary and convenient passway for tie wagons. Several years later the railway company fenced its right of way, except this crossing place, which was left open, as before, though cattle guards were placed there. The railway company, as it conclusively appears, maintained the tie yard for its use and convenience in receiving and storing ties, and kept up the crossing at all times. The evidence negatives any purpose or intention of the railway company to establish and maintain the crossing for the benefit of the public or the plaintiffs as a passageway over the track. As shown, the tie yard was quite a large one, and it and the crossing were used continuously by tie haulers until some six or seven years before this suit was entered. The railway company discontinued the tie yard about 1916. Mr. Phillips himself, as he says, hauled and stacked ties there for the railroad. He and his wife passed over the crossing at all times to reach highway No. 5 or to go south of the railway. Further, as shown:

"People coming from the south and going to Old Bluff Church, or to bury some one there (in the churchyard) would travel the road through this lane. * * * Anybody passed the crossing who wished to. A good many people used it. Anybody that wanted to use the crossing used it to cross over the railroad."

The entire evidence was to the point only that persons hauling ties and wood to the tie and wood yard and other persons used the crossing as a way at will. There are no circumstances attending its use by plaintiffs, or other persons, manifesting an intention to use it without regard to the wishes of the railway company, or adverse and hostile to its rights. On February 9, 1923, the railway company, or receivers, completely fenced up its right of way and thus closed the crossing, and it has not been open nor

(289 S.W.)

used since that date. It was proved that the county commissioners' court had, shortly before February 9, 1923, laid out and established a public road running north and south, and crossing the railway track and highway No. 5 at a point 732 feet west of the closed crossing. This public road was at the west line of the plaintiffs' farm. On this public road the railway company established a regular crossing for the public, and it was so used at the time of this trial. The evidence concerning the road was from witnesses who had lived in the neighborhood for a long time.

Mr. H. G. Bailey testified for plaintiffs:

"I have lived in the neighborhood 67 years. The railroad was built, I think, in 1875. Before the railroad was built, a road ran along where the crossing now is, on north to Ward's shop or plow factory. Everybody used it that wanted. I never heard of any objection being made. * * * The land where Mr. Phillips' farm now is, and practically all of the land around Mr. Ward's, was in timber. None of the land in that country was cleared. There were roads around through the woods in every direction. When people wanted to go to Mr. Ward's, they would travel this particular road."

Mr. Cummons testified for plaintiffs:

"I know about the crossing and the road before that time. The railroad was built in 1875. Before the railroad was built, there was a road going there where the crossing is now. At that time the country was a forest. This road went northward from where the crossing now is, and then a short piece [distance] away from the place where the crossing is now, it began to sprangle out along into a good many directions. That is, other roads intersected this road—the one from Stevenson Mill and the one from Allison Mill and the one from the Dinwiddie Mill. These were just sawmills. At that time we called it a public road. They did not travel this road much. They did not travel it hardly any."

J. H. Sharp testified for the defendant:

"I have known the crossing and the road passing over it northward since 1881. It was considered a neighborhood road. There was no labor ever done on it to improve it. In 1881 the lands both north and south of the crossing were in woods. Now the land south of the crossing is all fenced up. The crossing was considered a tie yard and a wood yard. The engines on the railway at that time in 1881 and afterwards used wood fuel, and they were stopped at that point to get wood. It was considered a wood yard. Wood and ties were piled on both sides of the track. After crossing the railway track, a crooked road ran northward intersecting a road used to go to Woodland from Bagwell. There was no road running east and west. The road ran in every direction through the woods, and the wagons hauling the wood would come from different parts of the country. They would come to the tie yard or wood yard at the crossing. This was no public road. The first public road was the Mayberry road crossing the railroad east of this place. I was one of the jury of view to establish the Mayberry road. Anybody used the road in suit and the crossing that wanted to. This road was traveled by the public in the same way that other woods roads or neighborhood roads were traveled."

Mr. Lettimore testified for plaintiffs:

"I have known the road in suit for 30 or 35 years. It is in the same place now that it has been for about 30 years; may possibly have been moved a few feet. Every time I traveled it, it looked to me like it was traveled a good deal. The crossing was used by the public, and was also used by the railway for ties, to place ties on the right of way in piles. Tie haulers on the south side would have to cross the track at the crossing. I hauled ties there."

Plaintiff J. T. Phillips said:

"I never knew anything about the road or crossing prior to 1901 and when I made the lane fence. I didn't think anything about a road being there until I had bought the land. There was a crossing over the railroad. I used the road, and so did my wife, constantly from the time I bought the land. It was generally used by the people. The crossing was in perfect condition. * * * I cut ties and sold them to the railroad company—stacked them there on my land next to the railroad. Other people stacked ties on the right of way. They continued to stack ties there after I moved on the place and before 1916."

Head, Dillard, Smith, Maxey & Head, of Sherman, and T. D. Gresham and R. S. Shapard, both of Dallas, for appellant.

Allen & Baughn, of Paris, for appellees.

LEVY, J. (after stating the facts as above). [1] The appellant assigns as error the refusal of the court to give a requested peremptory instruction to the jury to return a verdict in its favor. The proposition relied upon presents, in effect, the point in view, that there is no proof of use of the railway crossing as a passway by the public or the appellees inconsistent with and adverse to the continuing rights of the railway company, continued during the statutory period of limitation of ten years. It is believed that the evidence warrants the above contention of the appellant. While the proof is clear that a road leading through the appellees' premises, and thence across the railway right of way and track, had been used by the public generally and the appellees particularly for the whole period of limitation of more than ten years before the closing of the crossing in February, 1923, there is nothing in the evidence to show that this use was not merely permissive. There is not the slightest evidence that the public or the appellees ever claimed, or asserted, or did any act indicating a right to use the railway crossing as a passway, except by merely passing over it, and this use did not materially interfere with the use thereof by the railway company. There is no evidence that the road was ever worked or maintained as a public way. The evidence showed that at the time the rail-

way line was built in 1875 a road or passageway, running north and south, led by the place in suit.

At the time the railway was built, the railway company established a wood and tie yard on its right of way, and at the. same time constructed a crossing over the railway track at the place where the dirt road passed. The tie and wood yard was established by the railway company to be used for delivery and storage of ties and wood purchased by it from contractors. The crossing was a necessary and convenient passageway across the track for wagons hauling and delivering ties and wood to the yard. The yard was maintained for the delivery of ties, and the crossing was kept open and continually used by tie haulers from 1875 to about 1916, more than 40 years. February 9, 1923, the railway company completely closed the crossing. Also, as testified, "Eveybody used it that wanted," meaning the public generally, to pass and repass. The use of the crossing by the public and the appellees did not in any wise interfere with the use of the tie yard or the crossing by the tie haulers or the railway company. It was generally known and could plainly be seen by any person that the tie yard was being kept and maintained by the railway company, and that the crossing was kept open and maintained by the railway company for the convenience and necessary use of its tie contractors. In no wise, as admitted, was the roadway, before or since 1875, a public road as established by the commissioners' court or worked under its orders. It was never worked or maintained by the labor of the members of the public or the plaintiffs in this suit. It was never a roadway dedicated as such by the owners of the land. The roadway was, as proved, prior to 1875 and up to 1902, merely a passway used generally, running through uninclosed and uncleared lands. The roads intersecting this roadway were mainly roads leading to sawmills, and used, inferably, for the purpose of getting and drawing out logs from the woods. And since 1902 the road has never been worked as a road by the public or any one. During all such time the road, as well as the crossing, has been used by the plaintiffs, as well as anyone that wanted to do so, merely for passing and repassing. Such proof entirely negatives any presumption or inference that the public have used the road and maintained it as a public highway. And the evidence negatives any intention or purpose on the part of the railway company to recognize and acquiesce in any claim that the road was a public highway by maintaining a crossing over it.

[2, 3] Accordingly, in view of the evidence, it cannot be successfully contended that the appellees have acquired a right to use the railway crossing as a passway by prescription. The burden of proof was upon the appellees to establish a right by prescription over the crossing. Ry. Co. v. Wilson, 83 Tex. 153, 18 S. W. 325. The whole theory of prescription depends upon the presumption of a grant or of user under a claim of right and adverse. It is well established that, if the circumstances are such as to indicate the permissive use of the passway or its enjoyment as a mere privilege, such character of use does not ripen into a right by prescription, although continued for ten years or more. Heilbron v. Ry. Co., 52 Tex. Civ. App. 575, 113 S. W. 610, 979.

[4] In order to obtain a right by prescription, the circumstances attending its use must be such as to make it appear that its use was accompanied by a claim of right, or by such acts as manifest an intention to enjoy it adverse and hostile to the owner. Tolbert v. McClellan (Tex. Civ. App.) 241 S. W. 206; Cockrell v. City of Dallas (Tex. Civ. App.) 111 S. W. 977; Click v. Lamar County, 79 Tex. 121, 14 S. W. 1048; Ballard v. Bowie County, 59 Tex. Civ. App. 438, 126 S. W. 56; Ry. Co. v. Baudat, 21 Tex. Civ. App. 236, 51 S. W. 541; Ry. Co. v. Bluitt (Tex. Civ. App.) 204 S. W. 441; Ry. Co. v. Bryant (Tex. Civ. App.) 204 S. W. 443; 37 Cyc. 21.

The Baudat Case, supra, is relied upon by appellees in this case. The testimony in that case showed not only use of the road by the public generally, but of "its having been worked and looked on as a public road" for about 50 years. This shows its use was accompanied by a claim of right on the part of the public. And there was no other explanation of the construction or use of the crossing than "as a public crossing," which would tend to show recognition of the road as a public highway. The facts are essentially different from those of the instant case.

The judgment is reversed, and judgment is here entered in favor of appellant, with all costs of the trial court and of this appeal.